BRISCOE, Circuit Judge.
*1268 Petitioner Wendell Grissom, with the assistance of a man he had just met, randomly selected a rural Oklahoma home to burglarize. Upon realizing that the home was occupied by two women and two minor children, Grissom shot his way into the home, then killed one woman and seriously injured the other. After the injured woman was able to escape in Grissom's own vehicle, Grissom and his accomplice fled on a stolen all-terrain vehicle. Grissom and his accomplice were arrested shortly thereafter.
Grissom was tried and convicted in Oklahoma state court of first degree murder, shooting with intent to kill, possession of a firearm after former conviction of a felony, and larceny of a motor vehicle after two or more previous felony convictions. The jury fixed Grissom's punishment at death for the first degree murder conviction, and sentenced him to lengthy prison sentences for the other convictions.
After exhausting his state court remedies through a direct appeal and a single application for state post-conviction relief, Grissom filed a federal petition for writ of habeas corpus pursuant 28 U.S.C. § 2254. The district court denied Grissom's petition, but granted him a certificate of appealability (COA) with respect to one issue. We subsequently granted Grissom a COA with respect to two additional issues.
Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we now affirm the district court's denial of federal habeas relief.
I
The underlying facts of Grissom's crime
The Oklahoma Court of Criminal Appeals (OCCA) summarized the relevant underlying facts of Grissom's case in addressing his direct appeal:
On November 2, 2005, Appellant left Arkansas and headed west on Interstate 40, driving his white Chevrolet truck. Just across the Oklahoma state line, he picked up a homeless hitchhiker, Jessie Johns. As they continued west, the two men drank whiskey and got acquainted. They also discussed plans to commit some robberies or burglaries to raise money. Later that evening, Appellant checked into a hotel in Oklahoma City, paying $266.00 for a weekly rental. Appellant shared his room that evening with Jessie Johns, who slept on the floor.
The following morning, Jessie Johns watched as Appellant showed him how to load a .44 caliber black powder pistol, one of two firearms in Appellant's possession at the time. The other was a two-shot .22 caliber derringer. The two men drank more alcohol that morning as they again headed west in Appellant's truck on Interstate 40. They stopped around 10:45 a.m. at the Love's Country Store on Exit 108, where security cameras recorded each man buying a pair of brown cotton gloves. They then drove into rural Blaine County, looking for a house to burglarize.
Appellant ultimately parked his truck in the driveway of the residence of Matt and Dreu Kopf, near Hitchcock, in rural Blaine County. He told Jessie Johns to wait until the shooting was over and then come in and help him burglarize the house. Appellant approached a sliding door at the rear of the residence and knocked. Dreu Kopf was inside her home that morning with her best friend, *1269 Amber Matthews, and her two young children, eighteen month-old Rylie and infant Gracie Jo. Rylie was in her crib in the bedroom and Ms. Kopf was holding Gracie. Ms. Matthews answered the sliding glass door as Ms. Kopf turned in her glider chair to speak with Appellant. He asked Ms. Kopf if her husband was home. She replied that her husband was at work. Appellant told her he would come back later. Ms. Matthews closed the door, but seconds later Appellant reappeared. Ms. Kopf handed the baby to Ms. Matthews and approached the door again. Appellant shot a pistol round into the large glass pane and shattered it. He then stepped into the residence and fired a second shot at Ms. Kopf, striking her in the hand.
Amber Matthews ran with the baby into Rylie's bedroom. Ms. Kopf fought with the intruder and pushed him across the room onto a couch. While Ms. Kopf was on top of Appellant fighting him, she begged him to take what he wanted and leave. He just laughed at her as he pulled the black powder pistol from his waist and put it to her head. She grabbed at the weapon as he fired it, but a bullet tore through her hand and struck the side of her head, fracturing her skull. Appellant then stuck the big pistol in her hip and fired again. The force of this shot threw Ms. Kopf onto the floor.
Appellant got up and headed toward the bedroom where the children and Ms. Matthews were. Ms. Kopf then heard Ms. Matthews beg for her life, and the report from Appellant's pistol. Ms. Kopf escaped from the house to her garage and activated the overhead door. Realizing that she was leaving a blood trail for her killer to follow, she knew she could not hide. She saw the white truck in her driveway pointed toward the road for a getaway, and ran toward it.
Jessie Johns had left the truck and approached the residence after hearing several shots. He saw Ms. Kopf run from the house. He stepped through the shattered door and found Appellant standing over a wounded Amber Matthews. He watched as Appellant fired another shot into Ms. Matthews with the .44. Johns then told Appellant that someone had run from the house. Appellant ran toward the truck, tried to get inside, and fired his .44 pistol again at Ms. Kopf as she pulled away. Not far from her house, Dreu Kopf flagged down a trio of truckers hauling rock and told them that her friend and children were dead and she had been shot. One of the truck drivers, himself a retired police officer, got into the truck with Ms. Kopf. He reported the shooting by phone to the Kingfisher County Sheriff's Office and drove Ms. Kopf to the hospital in nearby Watonga.
Realizing their plans were foiled, Appellant and Johns attempted their escape from the crime scene on a red four-wheeler ATV they found in the Kopf's garage. A postal delivery man saw two men on the red four-wheeler leaving the Kopf residence with a black dog chasing them. The rock haulers, who had encountered Dreu Kopf only a few minutes earlier, saw two men speed past them on a red four-wheeler. The men on the four-wheeler ran out of gas after a short distance, but managed to hitch a ride with a passing farmer, who assumed they were laborers. He gave them a ride to the Hillstop Cafe, just over the Kingfisher County line on Highway 33.
The two women who were running the Hillstop Cafe that day became frightened when they noticed a pair of men looking in the windows of the store from outside and looking inside cars parked at the Hillstop. The two men then came in the store. Each bought an individual *1270 can of beer. One of the men, later identified as Jessie Johns, walked across the highway, ducked into some trees, and sat there drinking his beer. The other man headed across a wheat field on foot. Johns later walked back across the street and purchased a second can of beer. After he left the store the second time, one of the clerks called the Kingfisher County Sheriff's Office and reported two suspicious men hanging around the store. The clerks also asked the only customer in the store, a local man waiting on his lunch, to stay with them until the two strangers were gone.
Recognizing the possible connection to the report of a shooting at the nearby Kopf residence about thirty minutes earlier, Kingfisher County Sheriffs officers now raced toward the Hillstop Cafe. Not far away, emergency personnel and various officers of the Watonga Police Department, the Blaine County 4/11/2011 Sheriffs Office, and the Oklahoma Highway Patrol descended on the Kopf residence after the initial report of a shooting. Officers approached the home cautiously, but managed to enter and find the Kopf children alive. Amber Matthews was unconscious and mortally wounded. She died during a medical evacuation flight to an Oklahoma City hospital.
Back at the Hillstop Cafe, a Kingfisher County deputy sheriff approached Jessie Johns, who was now walking down the road, and detained him for investigation. The deputy questioned Johns briefly, searched him for weapons, and drove him back to the Hillstop Cafe. Meanwhile, law enforcement officers continued to gather information about the crimes at the Kopf residence and the suspicious persons reported at the Hillstop. About forty-five minutes after being detained, police arrested Jessie Johns for involvement in the four-wheeler theft and other crimes at the Kopf residence.
Investigators eventually located Appellant hiding in a rock pile near the Hillstop Cafe. They recovered a blood-stained .22 pistol and a pair of brown cotton gloves from his person. They ultimately recovered Appellant's .44 pistol and a second pair of brown cotton gloves discarded near the crime scene.
Grissom v. State, 253 P.3d 969, 973-75 (Okla. Crim. App. 2011) ( Grissom I ) (paragraph numbers and footnotes omitted).
Grissom's state trial proceedings
On November 10, 2005, Grissom was charged in Blaine County District Court with four criminal counts: (1) first degree murder, in violation of Okla. Stat. tit. 21, § 701.7(A) and (B) ; (2) shooting with intent to kill, in violation of Okla. Stat. tit. 21, § 652(A) ; (3) grand larceny, in violation of Okla. Stat. tit. 21, § 1705 ; and (4) possessing a firearm after a felony conviction, in violation of Okla. Stat. tit. 21, § 1283. On September 14, 2006, the State filed a bill of particulars alleging the existence of three statutory aggravating circumstances: (1) Grissom knowingly created a great risk of death to more than one person; (2) the murder was committed by a person serving a sentence of imprisonment after conviction of a felony; and (3) the existence of a probability that Grissom would commit criminal acts of violence that would constitute a continuing threat to society.
The case proceeded to trial on February 25, 2008. "Defense counsel at no point contested [Grissom's] guilt of first degree murder or the non-capital charges." Id. at 981. Instead, defense counsel repeatedly reminded the jury that Grissom "was admitting he committed first degree murder and the other crimes alleged, and was simply seeking to persuade the jury to spare his life due to his remorse and other mitigation evidence." Id. The jury ultimately found Grissom guilty of all four *1271 counts alleged against him. Id. at 973. The jury also sentenced Grissom to life imprisonment for the shooting with intent to kill conviction, twenty-five years' imprisonment for the grand larceny conviction, and forty years' imprisonment for the firearms conviction. Id.
During the penalty phase of trial, Grissom's attorneys urged the jury to consider numerous mitigating circumstances. At the conclusion of the second phase proceedings, the jury found that all three statutory aggravating circumstances alleged by the State were supported by the evidence, and in turn the jury fixed Grissom's punishment at death for the first-degree murder conviction.
The state trial court formally sentenced Grissom on June 17, 2008.
Grissom's direct appeal
Grissom filed a direct appeal, asserting twelve propositions of error. In connection with his direct appeal, Grissom also filed a motion for new trial based on what he described as newly discovered evidence of juror misconduct. The OCCA "remanded the [juror misconduct] issue[ ] presented in [that motion] to the district court for evidentiary hearing to permit the development of a complete record." Id. at 975. After the state trial court conducted an evidentiary hearing on the issue, the OCCA allowed for supplemental briefing and then heard oral arguments in the case. On April 1, 2011, the OCCA issued an opinion affirming Grissom's convictions and sentences for first degree murder, shooting with intent to kill, and possession of a firearm after former conviction of a felony. Id. at 996. The OCCA also modified Grissom's conviction for grand larceny "to a conviction for larceny of a motor vehicle, after two (2) or more previous felony convictions." Id.
Grissom filed a petition for writ of certiorari with the United States Supreme Court. That was denied on December 5, 2011. Grissom v. Oklahoma, 565 U.S. 1084, 132 S.Ct. 825, 181 L.Ed.2d 534 (2011).
Grissom's first application for state post-conviction relief
On July 21, 2010, while his direct appeal was still pending before the OCCA, Grissom filed an application for state post-conviction relief asserting five propositions of error. Grissom claimed, in pertinent part, that his trial attorneys were ineffective for failing to adequately investigate and present at the penalty phase additional relevant mitigating evidence.
The OCCA denied Grissom's application for state post-conviction relief in an unpublished decision issued on September 13, 2011. Grissom v. State, Case No. PCD 2008-928 (Okla. Crim. App. 2011) (Grissom II ).
The filing of Grissom's federal habeas petition
On December 12, 2011, Grissom initiated these federal habeas proceedings by filing a motion for appointment of counsel and another for leave to proceed in forma pauperis. The magistrate judge assigned to the case denied the motion for leave to proceed in forma pauperis, but granted Grissom's motion for appointment of counsel.
On December 4, 2012, Grissom's appointed counsel filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting eleven grounds for relief. Briefing in the case was completed on May 29, 2013, when Grissom filed his reply brief to respondent's answer.
On August 3, 2016, the district court issued an order denying Grissom's petition. On that same day, the district court also issued an order granting Grissom a COA on Ground Three of his petition, which alleged that Grissom's constitutional *1272 rights were violated when the state trial court concluded that the evidence did not support instructing the jury on lesser-included offenses. The district court also entered final judgment on August 3, 2016.
Grissom filed a timely notice of appeal.
Proceedings in this court
On February 16, 2017, we held a case management conference regarding Grissom's appeal. On February 17, 2017, we issued an order granting Grissom a COA on two additional issues: (1) Ground One of his petition, which alleged ineffective assistance of counsel, "limited to trial counsel's failure to (i) adequately investigate and present mitigating evidence of ... Grissom's organic brain deficits; (ii) request proper jury instructions on voluntary intoxication; and (iii) request proper jury instructions on a lesser-included offense"; and (2) Ground Eleven of the petition, which alleged cumulative error, "limited to the issues for which a [COA] has been granted, and any constitutional errors the [OCCA] considered to be harmless error." Order Dated February 17, 2017 at 1-2.
II
In accordance with the COAs issued by the district court and this court, Grissom asserts on appeal three propositions of error: (1) that his trial attorneys were ineffective for failing to adequately investigate and present mitigating evidence related to his organic brain deficits; (2) that the state trial court erred, and his trial attorneys were also ineffective, regarding first-stage instructions for intoxication and lesser-included offenses; and (3) cumulative error. We conclude that Grissom is not entitled to federal habeas relief on any of these claims.
Standard of review
"The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.' " Kernan v. Hinojosa, --- U.S. ----, 136 S.Ct. 1603, 1604, 194 L.Ed.2d 701 (2016) (quoting 28 U.S.C. § 2254(b)(1)(A) ). "If the state courts adjudicate the prisoner's federal claim 'on the merits,' § 2254(d), then AEDPA mandates deferential, rather than de novo , review, prohibiting federal courts from granting habeas relief unless the state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' § 2254(d)(1), or 'was based on an unreasonable determination of the facts,' § 2254(d)(2)." Id. If, however, the state courts did not address the merits of the prisoner's federal claim, the federal habeas courts review the claim de novo. Miller v. Champion, 262 F.3d 1066, 1071 (10th Cir. 2001). In doing so, this court "grant[s] due deference to [any] factual findings underlying the district court's determination." Id.
Proposition One - ineffective assistance of counsel - penalty phase
In his first proposition of error, Grissom contends that his trial attorneys were ineffective for failing to adequately investigate and present, during the penalty phase of his trial, evidence of his organic brain damage. Grissom argues that his trial attorneys "fail[ed] to follow up on multiple red flags for brain damage." Aplt. Br. at 11. "The red flags," Grissom asserts, "included very poor speech development as a child; neurological insults, including reported loss of oxygen at birth and at least three severe head injuries ; and long-term chronic heavy alcohol consumption." Id. Grissom complains that his trial attorneys "did not competently follow the lead of these blaring signals for brain damage/organic brain deficits" and instead "looked only to mental health practitioners without any brain-based expertise or focus."
*1273 Id. at 12. Grissom argues that had his trial attorneys obtained and presented evidence from a neuropsychologist, such as the one that his direct appeal counsel retained and utilized, the testimony of such an expert at the second stage proceedings "would have changed everything." Id. at 37.
a) Clearly established federal law applicable to the claim
The clearly established federal law applicable to this claim is the familiar two-part test outlined in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the first part of this test, a "defendant must show that counsel's performance was deficient." Id. at 687. "In light of the variety of circumstances faced by defense counsel and the range of legitimate decisions regarding how best to represent a criminal defendant, the performance inquiry necessarily turns on whether counsel's assistance was reasonable considering all the circumstances." Wong v. Belmontes, 558 U.S. 15, 17, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (internal quotation marks and brackets omitted).
Under the second part of the test, a "defendant must show that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id."Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. (emphasis added).
Where, as here, a defendant alleges that his trial counsel was ineffective for failing to investigate and present "mitigating evidence at a capital-sentencing proceeding, we evaluate the totality of the evidence-both that adduced at trial, and the evidence adduced in habeas proceedings." Littlejohn v. Royal, 875 F.3d 548, 553 (10th Cir. 2017) (quotation marks omitted). "In doing so, we ... consider the strength of the State's case and the number of aggravating factors the jury found to exist, as well as the mitigating evidence the defense did offer and any additional mitigating evidence it could have offered." Id. (quotation marks omitted). "We must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been." Id. (brackets and quotation marks omitted). Ultimately, "if there is a reasonable probability that at least one juror would have struck a different balance" then "prejudice is shown." Id. (brackets and quotation marks omitted).
b) The mitigating evidence presented at the second-stage proceeding
Grissom was represented at trial by the father-son team of John Coyle, III, and John "Billy" Coyle, IV (the Coyles). As noted, the Coyles essentially conceded during the first-stage proceedings that Grissom was involved in the offenses. Their second-stage strategy focused on establishing the following mitigating circumstances: Grissom's age (thirty-nine years old at the time of trial); Grissom's speech problems and learning disabilities as a youth; Grissom's emotional and family history; the fact that Grissom had not posed a threat to other inmates or detention staff since the time of his arrest; that Grissom was amenable to a structured prison setting and would pose little risk therein; that Grissom had zero incidents of violence while incarcerated in the Texas Department of Corrections from 1992 to 2002; Grissom's "excellent" institutional record while in the Texas Department of Corrections; that Grissom had a family who loved him and valued his life; that Grissom did not graduate *1274 from high school but earned a GED; that Grissom could contribute to prison society and be of assistance to others; Grissom was clinically depressed at the time of the crimes; Grissom did not have a violent past; Grissom had a significant history of drug and alcohol abuse; Grissom had a stormy and tumultuous marriage to Barbara Grissom Carlisle that contributed to his depression; Grissom demonstrated remorse in his video statement as well as in his letters to the victim's family; Grissom cooperated with law enforcement and did not resist arrest; Grissom admitted and accepted responsibility for his actions; Grissom was a victim of child sexual abuse; and Grissom was on medication for depression, and was intoxicated from alcohol, at the time of the offense.
In their second-stage opening statements, Grissom's trial attorneys asserted that these mitigating factors "[we]re not meant to be excuses for what happened." Trial Tr., Vol. VII at 46. Instead, they argued, the mitigating factors gave the jury "reasons to spare [Grissom's] life." Id. at 47. Grissom's trial attorneys specifically argued that, at the time of the offenses, Grissom was "a very sick lost man" who was "extremely depressed," "drunk," and "under a lot of mental stress," all of which caused him to "snap[ ]." Id. at 47-48.
To establish the existence of some of the alleged mitigating factors, Grissom's trial attorneys presented testimony from two expert witnesses: Terese Hall, a forensic psychologist and professor at Oral Roberts University; and Dr. Mitchell Dunn, a forensic psychiatrist.
Hall testified that she was hired to: conduct a general psychosocial history and assessment of Grissom's life; specifically note any emotional or mental problems that might exist; and conduct a risk assessment. Early on in her testimony, Hall noted that Grissom had been sexually molested for several years-beginning when Grissom was nine or ten years old-by an adult brother-in-law. Hall testified that Grissom did not tell anyone about the sexual abuse at the time it was occurring, and he remained reluctant to discuss it even as an adult. Hall opined that the sexual abuse continued to be a source of shame and upsetting thoughts for Grissom.
Hall found a number of developmental issues in examining Grissom's history. For example, she noted that Grissom's birth was a difficult one, and Grissom may have been deprived of oxygen for some period of time prior to delivery. In turn, Hall noted that Grissom had severe speech problems as a child, underwent years of speech therapy, and was teased by other children at school because of his speech difficulties. Hall noted that Grissom was also evaluated when he was in the fifth grade and the evaluator determined that Grissom had attention problems, learning disabilities, acute anxiety, emotional immaturity, and an impaired self-concept. Hall concluded that Grissom was a very shy, withdrawn and awkward child who was anxious, depressed, and socially isolated.
Hall testified that Grissom was involved in several motorcycle accidents during his childhood, at least one of which was very severe and resulted in his dropping out of high school at age sixteen. Hall testified that Grissom eventually earned his GED, possibly while he was imprisoned in Texas.
Hall also noted that Grissom began using alcohol and marijuana between the ages of seventeen and nineteen. Grissom also, Hall testified, began experimenting with harder drugs, such as LSD and methamphetamine. According to Hall, Grissom primarily used alcohol and marijuana. Hall testified that Grissom quickly began abusing both substances, and at some point resorted to burglary to support his habits.
Hall testified that Grissom's burglaries resulted in his incarceration in the State of *1275 Texas for approximately nine years. During that period of incarceration, Hall testified, Grissom had few disciplinary infractions, all of a minor nature, took a variety of classes, and received his commercial driver's license. Hall opined that Grissom thrived in the prison environment where he did not have access to alcohol or drugs or choices about what to do each day.
Hall testified that when Grissom was released from prison, he moved to Arkansas, began living in a trailer on his parents' property, and started working as a commercial truck driver. Shortly thereafter, in 2002, Grissom met an older woman named Barbara. The pair married three days after meeting and proceeded to live together in Grissom's trailer. According to Hall, the marriage was disastrous and chaotic, with a lot of fighting. Hall also testified that Grissom and his mother believed that Barbara was verbally abusive towards him.[1] The marriage ended in 2004.
According to Hall, Grissom began drinking and using pills again during the course of his marriage to Barbara, and he sought treatment on at least four separate occasions between 2003 and 2005. Hall testified that, in August 2003, a doctor diagnosed Grissom with depression and prescribed him an antidepressant. Grissom allegedly took the antidepressant for a short period of time, but ultimately stopped taking it because it interfered with his ability to drive for long hours as a commercial truck driver. Hall further testified that, in 2004, after Grissom's marriage ended, Grissom started drinking more heavily and was arrested on at least two occasions for driving under the influence. Because of those arrests and a failed drug test, Grissom lost his commercial driver's license.
Hall testified that, in December 2004, Grissom successfully completed an inpatient substance abuse program, but started drinking the day he was discharged in January 2005. In February 2005, Grissom attended a few counseling sessions in Arkansas but then stopped. In July 2005, Grissom received a prescription for the antidepressant Cymbalta from his family physician. Grissom proceeded to take Cymbalta semi-regularly, but continued to drink heavily.
After recounting Grissom's history, Hall explained the findings of the psychological tests that she administered to Grissom. To begin, she testified that Grissom's IQ testing indicated he had a normal IQ.[2] Hall in turn testified that she did not find any signs of psychosis on Grissom's part. Hall testified that the results of Grissom's Minnesota Multiphasic Personality Inventory (MMPI) showed high levels of depression and anxiety, as well as some possibility of suicidal thoughts. This type of profile, Hall testified, typically indicates a person has had serious and very longstanding problems with depression, anxiety and substance abuse. Additional personality traits associated with this profile, Hall testified, include being socially introverted, awkward around other people, and suffering from low self-esteem and social isolation.
Lastly, Hall testified about the results of the risk assessment she conducted on Grissom to determine his propensity for violence in various conditions and his likelihood of adjusting to a sentence of life *1276 imprisonment. Hall testified that the only higher risk factor was the fact that Grissom committed a burglary concurrent with the capital offense. Otherwise, Hall testified, there were a number of factors that she characterized as "protective" in nature, meaning they suggested that Grissom presented a lower risk of violence. Hall testified that these included the facts that Grissom: was thirty-nine years old; had no record of violent behavior or gang association while incarcerated; had no prior record of violent convictions; and had a good family structure and a supportive family. Considering all of these factors together, Hall opined that Grissom was in a very low risk category, meaning the chances were excellent that he would adjust very well to life in prison. Relatedly, Hall testified that Grissom did not make any excuses for his behavior in this case, which, according to Hall, was unusual for a criminal defendant in his position. Hall also testified that Grissom spontaneously expressed concern for the victims' families, as well as concern for the heartache that he had put his own family through.
Dunn, for his part, testified that he was hired by Grissom's attorneys to conduct a psychiatric evaluation of Grissom for potential use at trial. Dunn opined that Grissom, despite having committed the crimes at issue, was not a sociopath. Dunn explained that a sociopath is essentially an individual who is manipulative and antisocial in terms of criminal behavior, but who is "kind of slick" and has a "grandiose sense of self-worth." Trial Tr., Vol. VIII at 77. Such individuals, Dunn testified, think they are better than everyone else, take advantage of other people, and typically do not care about the impact of their behavior on other people. Dunn testified that Grissom, in contrast to a typical sociopath, had a sense of inferiority from very early on in his life, was weak, and did not know how to socially engage. Dunn also noted that Grissom did not seek to blame other people for the crimes that he committed, and this, Dunn testified, distinguished Grissom from most sociopaths and the mentally ill. Dunn in turn testified that Grissom's childhood sexual abuse had a significant impact on Grissom and was a source of anger and shame. Dunn opined that Grissom had suffered for an extended period of time from depression and alcoholism. Lastly, Dunn noted that Grissom expressed regret for his actions and spoke about having ruined the lives of two families.
In addition to these two expert witnesses, Grissom's trial attorneys presented testimony from four other witnesses. The first, Chuck McAnarney, was an Oklahoma State Bureau of Investigation employee who testified briefly about acting as custodian for certain items of evidence-including tax returns and other documents, a Cymbalta pill bottle, and two empty vodka bottles-that were seized from Grissom's truck and hotel room following his arrest. The second, Vicky Carter, was a longtime friend of Grissom. Carter testified that her first husband was physically abusive and that Grissom, on at least two occasions, took steps to protect her from him. Carter also testified that when she knew Grissom in the late 1980s, he would do anything to help others and would never engage in the acts of violence of which he was convicted.
The last two defense witnesses were Grissom's parents, Bobbie and Mary Grissom. Bobbie Grissom testified that, on November 3, 2005, the date of the crimes in this case, he received a phone call from Grissom saying he had passed his welding test and was going for a job interview at a company called Alliance in Oklahoma City. Bobbie Grissom testified that he and his wife would visit Grissom in prison, and he expressed sorrow for the victims of the crimes and families involved in the incident. Bobbie Grissom asked the jury to spare Grissom's life.
*1277 Mary Grissom began her testimony by expressing her regrets to the victims' families. Mary Grissom in turn testified that she thought alcoholism was Grissom's problem, and indicated that she had been unaware, until the trial, of the sexual abuse that Grissom suffered and the effects it had on him. Trial Tr., Vol. VIII at 115 ("It wasn't alcohol. It was child abuse that was eating his life. He was angry. He lashed out."). Mary Grissom then briefly testified about significant events in Grissom's life, including the serious motorcycle accident, his dropping out of high school, his time spent in prison in Texas, and his marriage to Barbara. Mary Grissom also asked the jury to spare her son's life.
At the conclusion of the second-stage proceedings, Grissom's lead attorney again stated that there was "no excuse for what happened," but he argued that "it doesn't take an excuse to decide, to make a moral decision to decide for life [imprisonment]." Trial Tr., Vol. IX at 19. He in turn argued that the death penalty is "for the worst of the worst" and "not for the pitiful." Id. at 20. He further argued that the murder "[wa]s a senseless impulsive act of a drunken depressed pitiful man." Id. at 22. Lastly, Grissom's lead attorney asked the jury to exercise mercy and spare Grissom's life.
c) Neuropsychological evidence presented by Grissom on direct appeal
Grissom was represented on direct appeal by attorneys Michael Morehead and Kathleen Smith from the Oklahoma Indigent Defense System's Capital Direct Appeals Division. These attorneys "referred ... Grissom to neuropsychologist, Antoinette McGarrahan, Ph.D., for a comprehensive neuropsychological evaluation to determine if [he] suffered from any cognitive impairments, and if so, the nature and severity of the same." Aplt. Br. at 13. McGarrahan, Grissom notes, "reviewed the records, conducted scientifically accepted and appropriate diagnostic tests, and ultimately found permanent, severe brain effects to ... Grissom's temporal and frontal systems of his brain." Id. She also, Grissom notes, "specifically diagnosed him with Dementia Due to Multiple Etiologies." Id. In the report that McGarrahan prepared, she opined that Grissom's "cognitive impairment resulted from the permanent organic brain effects of his repeated head injuries in combination with his severe alcoholism." OCCA Case No. D-2008-595, Application For An Evidentiary Hearing On Sixth Amendment Claims, Appendix 1-B at 12. McGarrahan also opined that "Grissom's severe cognitive dysfunction ... was present at the time of the ... offenses" and would have included "significant memory impairment and ... difficulties in planning, reasoning, and organiz[ing]." Id. Additionally, McGarrahan opined that the deficits are "permanent and ... put ... Grissom at risk for accelerated age-related decline in functioning compared to his unimpaired peers." Id.
In her report, McGarrahan also noted that Grissom's medical records indicated that, on November 3, 2006, while he was confined in the Blaine County Jail awaiting trial, he experienced "an episode of syncope (a transient loss of consciousness due to inadequate blood flow to the brain)." Id. at 5. Grissom was taken by ambulance to a local hospital where a CT scan of his head was performed. According to McGarrahan, the CT scan"results showed 'posterior hypodensity or intracranial hemorrhage.' " Id.
The OCCA affirmed Grissom's convictions and sentences on direct appeal and, in doing so, expressly rejected Grissom's assertion that his trial attorneys were ineffective for failing to discover and present evidence like that provided by McGarrahan:
*1278 In Proposition Eleven, counsel argues that the failure to utilize mitigating evidence of [Grissom's] neurological deficits violated his right to effective counsel. In his accompanying request for evidentiary hearing as permitted by Rule 3.11(B), Appellant presents the affidavit and report of a neuropsychologist[, Dr. McGarrahan,] who evaluated Appellant for this appeal. In the report of her evaluation, the neuropsychologist concludes that Appellant meets the diagnostic criteria for dementia due to multiple etiologies, specifically possible deprivation of oxygen during his birth, a history of head injuries, and chronic abuse of alcohol. The neuropsychologist concludes that Appellant:
has overall low average intellectual abilities ... with moderately severe memory dysfunction and significant impairment in planning and organization abilities. His relatively intact verbal comprehension and vocabulary skills give him the appearance that he is higher functioning than is the case, cognitively. His overall pattern of cognitive dysfunction appears consistent with multiple brain insults, possibly beginning with the reported lack of oxygen at birth, but particularly relevant are the repeated significant head injuries in adulthood in combination with chronic, severe, and heavy alcohol consumption and suggests primary involvement of temporal lobes, bilaterally, with implication of the frontal systems as well.
... Mr. Grissom's cognitive difficulties meet the Diagnostic and Statistical Manual for Mental Disorders-Fourth Edition, Text Revision criteria for Dementia Due to Multiple Etiologies ...
Mr. Grissom presently suffers from significant cognitive dysfunction involving memory and planning, reasoning and organization abilities ... Mr. Grissom's cognitive impairment resulted from permanent organic brain effects of his repeated head injuries in combination with his severe alcoholism ... [A]t the time of the instant offenses Mr. Grissom's significant memory impairment and his difficulties in planning, reasoning, and organization abilities were made worse by his ingestion of a large amount of alcohol and likely impaired his ability to function in a cognitively efficient manner.
The record also reflects that Appellant retained a forensic psychologist [Terese Hall] and a forensic psychiatrist [Dr. Dunn] to testify in his defense at trial. These expert witnesses evaluated Appellant and gave extensive testimony of their findings, including Appellant's reported history of a difficult birth, academic and social problems at an early age; a history of head trauma ; his criminal history and imprisonment; abuse of alcohol; depression; and his troubled marriage. Neither of Appellant's expert witnesses at trial expressly diagnosed Appellant as suffering from dementia at the time of these offenses.
Under [OCCA] Rule 3.11(B)(3)(b)(i), this Court reviews the affidavits and evidentiary materials submitted by Appellant to determine whether they contain "sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." If the Court determines from the application that a strong possibility of ineffectiveness is shown, we will "remand the matter to the trial court for an evidentiary hearing, utilizing the adversarial process, and direct the trial court to make findings of fact and conclusions of law solely on the issues and evidence raised in the application." Rule 3.11(B)(3)(b)(ii). The *1279 evidentiary record thus created in the district court may then be admitted as part of the record on appeal and considered in connection with Appellant's claims of ineffective counsel. Rule 3.11(B)(3) and (C).
We have recently emphasized that our reading and application of Rule 3.11 is not inconsistent with Strickland ; nor does it lade appellants with a heavier burden to demonstrate ineffectiveness on appeal than Strickland itself.
This standard is intended to be less demanding than the test imposed by Strickland and we believe that this intent is realized. Indeed, it is less of a burden to show, even by clear and convincing evidence, merely a strong possibility that counsel was ineffective than to show, by a preponderance of the evidence that counsel's performance actually was deficient and that but for the unprofessional errors, the result of the proceeding would have been different as is required by Strickland . Thus, when we review and grant a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we do not make the adjudication that defense counsel actually was ineffective. We merely find that Appellant has shown a strong possibility that counsel was ineffective and should be afforded further opportunity to present evidence in support of his claim. However, when we review and deny a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we necessarily make the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in Strickland .
Simpson v. State , 2010 OK CR 6, ¶ 53, 230 P.3d 888, 906.
After considering Appellant's claim in light of the evidence offered at trial, the arguments in his brief, and his supplemental materials, the Court finds that Appellant has not shown clear and convincing evidence that suggests a strong possibility that trial counsel was ineffective in failing to develop and utilize the type of evidence presented here. The neuropsychological report largely reflects the mitigating narrative already presented at trial. Other aspects of the report are equivocal, at best: The mitigating force of Appellant's reported deficits in memory, planning, and organizational skills-as a result of his alleged dementia-is significantly diminished by other undisputed evidence of how he carried out these crimes. To borrow a phrase from his expert, if Appellant had been slightly more "cognitively efficient" in the execution of his plans, he certainly would have murdered Dreu Kopf, and might have avoided apprehension altogether, or at least long enough to endanger additional lives. The proffered evidence of Appellant's diagnosis with dementia and its accompanying deficits does not appreciably alter the balance of aggravating and mitigating circumstances considered by the jury at trial. We conclude that Appellant has not shown that counsel was ineffective for failing to utilize the type of evidence presented in his supplemental materials, and no evidentiary hearing is necessary. Appellant's request for evidentiary hearing and Proposition Eleven are denied.
Grissom I, 253 P.3d at 994-96 (paragraph numbers omitted).
d) Additional evidence cited by Grissom for the first time in this habeas action
Grissom's appointed attorneys in this federal habeas action forwarded Grissom's 2006 CT scan results (the results mentioned *1280 by McGarrahan in her report) "to neuroradiologist, L. Anne Hayman, M.D." Aplt. Br. at 16. According to Grissom, "Dr. Hayman could easily see [he] has brain atrophy much greater than expected for his age." Id."The atrophy," Grissom asserts, "was observable in the prefrontal cortex and related to the brain insults [he] received in his motorcycle wrecks, or possibly from the asphyxia he reportedly experienced at birth." Id. at 16-17. According to Dr. Hayman, "[t]he structural damage that was visible from the CT scan shows damage to an area thought to mediate socially inappropriate behavior, and can produce marked personality changes, impulsivity, and explosiveness, among other behaviors." Id. at 17.
Dr. Hayman ordered an MRI to be conducted on Grissom's brain. "The MRI confirmed her findings from the CT scan and showed additional abnormalities, both congenital and acquired." Id. According to Dr. Hayman, "[t]he three most striking abnormalities include that Grissom's cerebellum is 'roughly 60% smaller than a normal cerebellum,' his occipital lobe is 'mal-positioned and 20% larger than normal,' and his lateral ventricle is '10X larger than that of the normal brain.' " Id. In turn, "[t]he enlarged ventricle shows 'generalized loss of brain tissue' because as brain tissue dies the ventricle cavity, which is filled with cerebrospinal fluid, gets larger." Id. at 17-18. This "damage found is in areas of the brain 'known to impact behavior.' " Id. at 18. For example, the congenital and acquired damage that occurred to Grissom's cerebellum can "adversely affect the critical 'executive functions' of the frontal lobes." Id. Further, according to Dr. Hayman, Grissom's "severe motor vehicle accidents" likely resulted in damage to his "cerebrum, both the pre-frontal cortex and the lateral ventricle." Id. at 18-19. The pre-frontal cortex, Dr. Hayman explains, is the "area of the brain ... responsible for mediating socially appropriate behavior," and "[d]amage in this area can produce marked personality changes, including impulsivity, explosiveness, tactlessness, liability and lack of interpersonal sensitivity." Id. at 19.
Grissom's habeas counsel also hired three other experts: (1) Dr. Bhushan Agharkar, a medical doctor board certified in adult and forensic psychiatry; (2) Dr. Victoria Reynolds, a licensed clinical psychologist and forensic consultant on the effects of trauma; and (3) Kim Light, who holds a Ph.D. in pharmacology.
Agharkar conducted a psychiatric evaluation of Grissom in August and September 2012. ROA, Sealed Vol. 3 at 34-35. Agharkar opined, "to a reasonable degree of medical certainty, that ... Grissom suffers from Cognitive Disorder, Not Otherwise Specified, and complex Post Traumatic Stress Disorder (PTSD)." Id. at 39. Agharkar also noted that Grissom "has a past history of significant alcohol and drug use which appear to serve as self-medication for his conditions." Id. Agharkar noted that Grissom's "[tr]ial counsel and their experts touched [on] the existence of the[ ] issues" of Grissom's past sexual abuse at the hands of his brother-in-law and Grissom's abuse of illicit drugs and alcohol, "but failed to explain how these are related issue[s], despite a broad literature on the subject." Id. at 41. Agharkar opined that "[t]o not discuss this relationship and their attendant effects on brain and behavior was a considerable oversight." Id.
Reynolds evaluated Grissom in September 2012 "regarding his reported experience of sexual abuse and other traumatic experiences that he endured in his development." Id. at 51.
Light, for her part, prepared a report "addressing several questions related to the pharmacology of drugs and alcohol and the disease of addiction as it relates to ... Grissom." Id. at 189. Light, in particular, *1281 extrapolated that Grissom's blood alcohol level at the time of the crimes was between .18% and .29%
Grissom asserted in his federal habeas petition that "[t]he reports/declarations of ... Agharkar, Reynolds, and Light confirm what was revealed after [his] conviction in state court; namely, that much compelling mitigation evidence was missed, and the multiple and synergistic traumas suffered in [his] life had not only an individualized effect but a combined effect on him." Id. at 23 (emphasis in original). He argued that the new evidence developed by his habeas counsel was "clearly tied to existing claims previously raised in state court and d[id] not substantially change them." Dist. Ct. Docket No. 20 at 29. And, notably, Grissom asserted that he was not "offer[ing] this [new] evidence to assess whether the OCCA's adjudication under § 2254(d)(1) [wa]s contrary to law or unreasonable," and instead was simply offering it to "support that a constitutional violation occurred and can be considered by th[e] [district] court in deciding whether to grant relief." Id. at 29-30. Alternatively, Grissom asked the district court to hold his case "in abeyance to permit [him] to exhaust this material in a second post-conviction application" (the district court rejected that request). Id. at 30.
e) Was the OCCA's analysis of Grissom's claim contrary to or an unreasonable application of Strickland?
Because the OCCA considered and applied the analytical framework outlined in Strickland in rejecting Grissom's ineffective assistance claim on direct appeal, we must determine whether, under § 2254(d), the OCCA's analysis was contrary to or an unreasonable application of Strickland. As we read the OCCA's decision, it disposed of Grissom's ineffective assistance claim primarily, if not exclusively, "on the ground of lack of sufficient prejudice." Strickland, 466 U.S. at 697, 104 S.Ct. 2052. That reading will therefore frame our § 2254(d) analysis of the OCCA's decision. See Littlejohn v. Royal, 875 F.3d 548, 552 (10th Cir. 2017) (adopting similar approach-addressing only prejudice prong of Strickland-in disposing of petitioner's ineffective-assistance claim).
Grissom focuses on the unreasonable application prong of § 2254(d), arguing that "[t]he OCCA presented two completely unreasonable rationales for" rejecting his claim of ineffective assistance on direct appeal. D. Ct. Dkt. No. 20 at 11 (Habeas Pet. at 11). First, Grissom notes, the OCCA concluded that the evidence presented by Grissom on direct appeal, i.e., the neuropsychological report from Dr. McGarrahan, "largely reflect[ed] the mitigating narrative already presented at trial." Grissom I, 253 P.3d at 995. Grissom argues that this rationale was unreasonable because "Terese Hall and Mitchell Dunn are both mental health professionals" who "were not qualified to detect [his] brain deficits," and "[a] review of their testimony reveals they did not mention his brain one single time." D. Ct. Dkt. No. 20 at 11. Grissom argues that McGarrahan's findings of permanent organic brain effects from his multiple head injuries and severe alcoholism were "something else entirely from the narrative that was [actually] presented" at his second stage proceeding. Id. at 12.
The OCCA's second rationale, Grissom asserts, was that "[o]ther aspects of [McGarrahan's] report [we]re equivocal, at best." Grissom I, 253 P.3d at 995. In particular, the OCCA stated that "[t]he mitigating force of [Grissom's] reported deficits in memory, planning, and organizational skills-as a result of his alleged dementia-[were] significantly diminished *1282 by other undisputed evidence of how he carried out these crimes." Id.
Grissom argues that this second rationale is "patently unreasonable." D. Ct. Dkt. No. 20 at 12. Specifically, he argues that "[t]he mitigating effect of [his] brain-based memory, planning, and organizational deficits is paradoxically negated in the OCCA's mind on the basis of how he carried out the crime, as if it was brilliantly orchestrated, rather than pathetically un -orchestrated." Id. at 12-13. Furthermore, Grissom argues, "reduced cognitive efficiency [wa]s merely one of many deficits referenced by Dr. McGarrahan in her report." Id. at 13. Ultimately, Grissom argues that "it really came down to" the fact that "the OCCA judges themselves do not understand how critical neuropsychological impairments are and how they relate to the myriad legal issues arising in capital trials." Id.
Addressing Grissom's arguments in order, we are not persuaded that the OCCA was unreasonable in concluding that McGarrahan's "neuropsychological report largely reflect[ed] the mitigating narrative already presented at trial." Grissom I, 253 P.3d at 995. As discussed, the two expert witnesses presented by Grissom's trial attorneys during the second-stage proceedings, Hall and Dunn, essentially outlined for the jury all of the significant events in Grissom's life, including his: difficult birth; speech problems as a child; history of head injuries and the effect they had on his school attendance (causing him to drop out of high school at age sixteen); criminal history; abuse of drugs and alcohol; marriage and divorce; and depression. McGarrahan's report was similar in the sense that a large segment of it (pages 3 through 7 out of the thirteen-page report) detailed key portions of Grissom's life history under headings entitled: "Childhood and Family History"; "Educational History"; "Vocational History"; "Military History"; "Medical History"; "Psychiatric/Psychological History"; "Substance Abuse/Dependence History"; "Legal History"; and "Marital/Relationship History." In the "Clinical Summary" section of her report, McGarrahan in turn noted that Grissom's "childhood [wa]s notable for a couple of years of sexual abuse by an adult male when he was only 10 or 11 years old," his "[e]arly history [was] remarkable for very poor speech development that required many years of speech therapy," he experienced a series of "[n]eurological insults, including reported loss of oxygen at birth" and "at least three severe head injuries, one of which occurred in the 9th grade and resulted in his inability to return to school," and that he exhibited "chronic heavy alcohol consumption over the course of many years." McGarrahan Report at 11.
McGarrahan's report also, under a heading entitled "Emotional/Psychological/Personality Functioning," discussed the results of a "Personality Assessment Inventory (PAI)" that McGarrahan administered to Grissom. Id. at 10. The PAI results, McGarrahan noted, "revealed extreme elevations on both the alcohol and drug scales." Id. According to McGarrahan, "[i]ndividuals with this type of profile report that drugs and alcohol have caused severe negative consequences in their lives, including significant problems with the law, employment, and maintenance of relationships." Id. McGarrahan further noted that "Grissom's profile ... demonstrated that his personality style involves a degree of adventurousness, risk-taking, and a tendency to be rather impulsive, mostly likely when using alcohol and drugs." Id.
Of course, it is undisputed that neither Hall nor Dunn conducted a neuropsychological evaluation of Grissom or otherwise touched on the possibility of brain damage. Nor, in turn, did they testify about the *1283 cognitive difficulties that were discussed by McGarrahan in her report. But, considering McGarrahan's report in its entirety, we conclude it was not unreasonable for the OCCA to conclude that the report "largely reflect[ed] the mitigating narrative" that was actually presented by Grissom's trial attorneys during the second-stage proceedings. Grissom I, 253 P.3d at 995 (emphasis added).
Turning to Grissom's second argument, we are not persuaded it was unreasonable for the OCCA to conclude that "[o]ther aspects of [McGarrahan's] report [we]re equivocal, at best." Id. In support of this conclusion, the OCCA stated that "[t]he mitigating force of [Grissom's] reported deficits in memory, planning, and organizational skills-as a result of his alleged dementia-[were] significantly diminished by other undisputed evidence of how he carried out these crimes." Id. Although the OCCA did not offer any further explanation, the record reasonably supports this statement. The State's first-stage evidence established that Grissom, with the assistance of Jessie Johns, knowingly and intentionally decided to commit an armed burglary or robbery on the morning of November 3, 2005. In carrying out this decision, Grissom and Johns first stopped at a convenience store and each purchased a pair of brown cotton gloves. After doing so, they proceeded to drive into rural Blaine County (Oklahoma) "looking for a house to burglarize." Id. at 974. Once they selected the Kopf's residence, Grissom parked his truck in the driveway, with the front of the vehicle facing towards the road in order to facilitate his escape. Grissom told "Johns to wait until the shooting was over and then come in [the residence] and help him burglarize the house." Id. Grissom then approached the rear sliding door of the residence, knocked, and, when Dreu Kopf answered, gave a false name and story and asked if Dreu Kopf's husband was home. When Dreu Kopf said that her husband Matt was at work, Grissom told her he would come back later, acting as if he had legitimate reasons for needing to speak with Matt. After briefly disappearing from view, Grissom then reappeared in front of the sliding glass door and began firing into the house. In sum, notwithstanding McGarrahan's opinions regarding Grissom's "difficulties in planning, reasoning, and organization abilities," McGarrahan Report at 12, the State's evidence clearly established that Grissom's crimes involved some degree of planning, reasoning and organization. That is, any difficulties that Grissom may have experienced in planning, reasoning, and organizing did not prevent him from carrying out the crimes of conviction.
Grissom also challenges the OCCA's statement that "if Appellant had been slightly more 'cognitively efficient' in the execution of his plans, he certainly would have murdered Dreu Kopf, and might have avoided apprehension altogether, or at least long enough to endanger additional lives." Grissom I, 253 P.3d at 995. This statement was perhaps intended by the OCCA to suggest that Grissom's purported difficulties in planning, reasoning, and organization may have actually reduced the severity of the offense and, in turn, diminished his ability to elude law enforcement authorities after the offense. In other words, the OCCA appears to have been suggesting, and reasonably so in our view, that Grissom's purported deficiencies in planning, reasoning, and organization did not cause the offense, but instead diminished its severity.
Lastly, Grissom argues that "it really came down to" the fact that "the OCCA judges themselves do not understand how critical neuropsychological impairments are and how they relate to the myriad legal issues arising in capital trials." D. Ct. Dkt. No. 20 at 13. This generic argument *1284 is not supported by the record. The fact of the matter is that the OCCA considered McGarrahan's neuropsychological report, and it ultimately concluded that the presentation of McGarrahan's testimony would not have altered the outcome of the second-stage proceedings. For the reasons already stated, that conclusion was not unreasonable.
Notably, Grissom does not directly challenge the OCCA's ultimate conclusion that "[t]he proffered evidence of [his] diagnosis with dementia and its accompanying deficits d[id] not appreciably alter the balance of aggravating and mitigating circumstances considered by the jury at trial." Grissom I, 253 P.3d at 995. And, in any event, this conclusion is reasonably supported by the record in this habeas appeal. More specifically, we are not persuaded that McGarrahan's proffered opinions regarding Grissom's cognitive impairments and his resulting "difficulties in planning, reasoning, and organization abilities" would have caused the jury to find that the mitigating factors outweighed the aggravating factors and to in turn sentence him to life in prison rather than death.
In sum, we conclude that the OCCA did not unreasonably apply Strickland in rejecting Grissom's ineffective-assistance claim on the basis of lack of prejudice. We therefore reject Proposition One of Grissom's appellate brief.[3]
Proposition Two - intoxication and lesser included offenses
In Proposition Two of his appellate brief, Grissom asserts two factually related, but legally distinct, claims arising out of his intoxication defense and the state trial court's failure to instruct the jury on the possibility of lesser-included offenses. Specifically, Grissom claims that the state trial court violated his constitutional rights by failing to instruct the jury on lesser-included offenses and by failing to adequately instruct the jury on the defense of intoxication. In addition, he argues that his trial attorneys were ineffective for failing to request instructions on lesser-included offenses.
a) Clearly established federal law applicable to the claim
The clearly established federal law applicable to Grissom's claim of ineffective assistance is the two-part Strickland test. As previously discussed, that test requires a defendant to show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052.
The clearly established federal law applicable to Grissom's claim that the state trial court violated his constitutional rights by failing to instruct the jury on lesser-included offenses is outlined in the Supreme Court's decision in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In Beck, the Supreme Court held that "a sentence of death [may not be] constitutionally ... imposed after a jury verdict of guilt of a capital offense" if "the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Id. at 627, 100 S.Ct. 2382 (quotation marks omitted). The Court explained that "providing the jury with the 'third option' of convicting on a lesser-included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard." Id. at 634, 100 S.Ct. 2382. "[W]hether an offense is a lesser-included offense of the charged offense is a matter of state law." Fairchild v. Trammell, 784 F.3d 702, 714 (10th Cir. 2015).
*1285 Lastly, the clearly established federal law applicable to Grissom's claim that the state trial court erred by failing to adequately instruct the jury regarding his intoxication defense is set forth in the Supreme Court's opinion in Cupp v. Naughten, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). There, the Supreme Court held that "[b]efore a federal court may overturn a conviction resulting from a state trial in which [a challenged] instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Id. at 146, 94 S.Ct. 396 (quotation marks omitted). For example, the Court noted, habeas relief would be warranted where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id. at 147, 94 S.Ct. 396. The Court emphasized that "[i]n determining the effect of [a challenged] instruction on the validity of [a] conviction," the instruction "must be viewed in the context of the overall charge." Id. at 146-47, 94 S.Ct. 396.
b) Facts relevant to the claims
As the OCCA noted in disposing of Grissom's direct appeal, Grissom's trial attorneys "conceded [Grissom's] guilt to all of the[ ] charges at [the first stage of] trial." Grissom I, 253 P.3d at 980. The OCCA detailed these concessions in its opinion denying Grissom's direct appeal:
In the beginning of defense voir dire , and with Appellant's express consent, defense counsel stated to prospective jurors:
I have been trying to think about how to say this and I really don't know any other way to say it than to say it. The evidence is going to show that on November 3, 2005 about 12:30 in the afternoon that Wendell Grissom shot and murdered a beautiful 23 year old girl in cold blood. So now I said it. Now you know it. It will show that he also shot another young girl who was there with her children. She struggled for her life and got away ... The evidence will show that Wendell Grissom was the man who pulled the trigger.
During his voir dire examination, trial counsel described Appellant's crime as "a cold-blooded, calculated, premeditated act of murder." He told prospective jurors:
I'm going to make sure you understand that there is no question that ... he is guilty of premeditated first degree murder;
* * *
It will be a clear cut case of murder in the first degree, I can assure you of that;
* * *
[I]t will be proven that he will be guilty of murder in the first degree and in a premeditated manner took the life of a 23 year old girl who had nothing to do with it. There is no reason for it;
* * *
And I will tell you because we want to get people on the jury who are able to give real meaningful consideration to all of the possible penalties in the case ... the evidence that the prosecutors introduce will show you that he murdered a beautiful 23 year old girl and he shot another beautiful girl, neither of which had any involvement in it, they didn't cause, they didn't have anything to do with it. That is what the evidence will show in this case. So that's where we are going to come to in this case, is that if you are selected to sit on this jury ... you are going to have to decide whether that young man lives or dies. Because that's what the evidence is going to show.
*1286 * * *
[W]e will present evidence on behalf of Mr. Grissom evidence about his life and evidence about what happened in his life that brought him to that magic day. Things like his incredible drinking problem, very drunk at the time it happened. Those are some things. They are not legal defenses to murder. They are in mitigation to whether or not, as to the penalty he should receive . (emphasis added).
In opening statements to the jury, trial counsel continued this strategy by conceding that "there are no excuses for what Wendell Arden Grissom did that day." Counsel told the jury the facts of Appellant's life, the facts of the crimes as Appellant had admitted them, and described him as a man "whose alcoholism has spiraled out of control, and [who] has done nothing but drink since 2002." Counsel emphasized Appellant's desire to accept responsibility, saying, "Wendell has never once ran, for one second ran from this crime ... He has always stood up and said I did it and I'm here to face it." Trial counsel concluded his opening statement by saying:
And when this is all said and done I'm going to ask you to find my client guilty, guilty of felony murder. And after that we'll go on to another stage. And from there you will see who Wendell Grissom is and you'll decide what the appropriate punishment should be ... Wendell Grissom is not going to sit up here and say that Jessie Johns made him do this or that he did this because Satan took him over or overtook him. He is a truly remorseful man for what occurred.
Defense counsel modified his strategy only slightly in his first stage closing argument, again emphasizing Appellant's "acceptance of responsibility," but referencing his consumption of alcohol and suggesting that jurors could find Appellant did not act with malice aforethought. Counsel told jurors:
He drank a fifth of alcohol the night before and began drinking the first thing the next morning. Words. I want a cigarette is all he says about fifty times. He goes into this lunatic type rant about his ex-wife over and over again, about the problems she has caused him. His demeanor. Look at the video. And his motive. His motive. He admits to the crime. Wendell Grissom is not a calculated killer. He is a lost soul whose life spiraled out of control. I take nothing away from his actions, but ask you to look at everything that happened that day and led up to these events. It's of a lost man whose alcoholism and depression spiraled into a recipe for destruction.
Defense counsel at no point contested Appellant's guilt of first degree murder or the non-capital charges. The record is replete with counsel's statements that Appellant was admitting he committed first degree murder and the other crimes alleged, and was simply seeking to persuade the jury to spare his life due to his remorse and other mitigation evidence.
Grissom I, 253 P.3d at 980-81 (paragraph numbers and footnote omitted).
As stated by the OCCA, Grissom's trial attorneys "modified [their] strategy only slightly in [their] first stage closing argument, again emphasizing [Grissom's] 'acceptance of responsibility,' but referencing his consumption of alcohol and suggesting that jurors could find [he] did not act with malice aforethought."[4] Id. at 981.
*1287 At the conclusion of the first-stage proceedings, the state trial court did not instruct the jury on any lesser-included offenses and defense counsel did not request that it do so. Id. at 982. The state trial court did, however, "without a request from the defense or an objection from the State, g[i]ve the following instructions on the defense of voluntary intoxication" at the conclusion of the first-stage proceedings:
Evidence has been introduced of intoxication of the defendant as a defense to the charge that the defendant has committed the crime of First Degree Murder. [Instruction No. 21, State ROA at 620]
The crime of Murder in the First Degree has as an element the specific criminal intent of Malice Aforethought . A person is entitled to the defense of voluntary intoxication if that person was incapable of forming the specific criminal intent because of his intoxication. [Instruction No. 22, State ROA at 621]
Definitions: Drugs-Substances intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in a human or other animal; substances other than food intended to affect the structure or any function of the body of a human or other animal; under the law, the substance Cymbaltais a drug . [Instruction No. 23, State ROA at 622]
Id. at 983 (footnote omitted).[5] "The district court did not give applicable instructions on the burden of proof for a defense of voluntary intoxication, or various definitions related to this defense." Id. (footnotes omitted).
In affidavits submitted to this court, Grissom's trial attorneys concede that they "had no strategic or tactical reason not to request lesser-included offense instructions." ROA, Sealed Vol. 3 at 22 (Affidavit of John W. Coyle, III); id. at 16 (Affidavit of John W. Coyle, IV). Also, attorney John W. Coyle, VI asserts that he "did not realize at the time [of trial] the voluntary intoxication defense [wa]s tied to lesser included offense instructions." Id. at 16.
c) Grissom's presentation of these claims to the OCCA
In Proposition One of his direct appeal, Grissom argued that the state trial court erred by failing to instruct the jury on the lesser included offenses of second degree murder, first degree manslaughter, and misdemeanor manslaughter. In Proposition Two of his direct appeal, Grissom argued that the jury instructions on voluntary intoxication were incomplete and confusing and thus deprived him of his right to a fair trial.
The OCCA considered and rejected both of these arguments. With respect to Proposition One (state trial court's failure to *1288 instruct on lesser included offenses), the OCCA concluded that Grissom "ha[d] waived review of the[ ] alleged errors by failing to request instructions on lesser-included offenses and failing to object to the instructions given by the district court at trial." Grissom I, 253 P.3d at 980. Consequently, the OCCA considered only "whether the trial court committed plain error in its failure to instruct the jury on lesser-included offenses to the capital and non-capital charges." Id. at 982. After reviewing the trial record, the OCCA concluded that no plain error occurred because Grissom's "admission of guilt to the charges, through numerous statements of his counsel during trial, constituted a valid strategic election to present only a sentencing stage defense" and that, "[b]y electing a sentencing stage defense, [Grissom] foreclosed his claim to first-stage instructions on lesser-included offenses." Id.
As for Proposition Two (that the jury instructions on voluntary intoxication were incomplete and confusing), the OCCA emphasized "the narrow parameters of the voluntary intoxication defense" under Oklahoma state law. Id. at 983. Specifically, the OCCA noted that the defense " 'requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent ... element of the crime .' " Id. (quoting McElmurry v. State, 60 P.3d 4, 23 (Okla. Crim. App. 2002) (emphasis added by OCCA) ). The OCCA "conclude[d] that no relief [wa]s warranted for the apparent errors in the trial court's instructions in voluntary intoxication." Id. at 985. The OCCA explained:
While the evidence established Appellant's consumption of alcohol and prescription medication, it did not create a prima facie case that Appellant was so intoxicated that he could not form the specific intent to commit these crimes. Appellant loaded his pistols and left Oklahoma City that morning driving west. He and his accomplice bought gloves at a convenience store shortly before the crimes. He targeted an isolated rural residence for a home invasion burglary because he needed money. He parked his truck in the driveway of the home pointed toward the road for a quick getaway, telling his accomplice to follow him when the shooting stopped. He engaged his unsuspecting victims in a pretextual conversation, giving them a false name and a phony cover story, then stormed the home with gunfire. He attempted to murder the homeowner, and surely believing he had succeeded, he executed her friend with two shots to the head from his .44. He fled on a stolen four wheeler when the surviving victim took his waiting truck and made her escape. He bought and paid for a beer at a country cafe within an hour of the shootings. Appellant later surrendered and cooperated with authorities in locating the murder weapon where he had discarded it shortly after his crimes.
Appellant gave a detailed confession within hours after the shootings. He was able to recount the details of his recent activities and his life history leading up to the crimes. He also effectively admitted his guilt of murder at trial, hoping to avoid the extreme punishment. Under these circumstances, we find the trial court abused its discretion in even administering a voluntary intoxication instruction; and Appellant cannot use the fact that this unjustifiable instruction was given to obtain reversal. The instructions on voluntary intoxication were not plain error. Proposition Two requires no relief.
Id. (paragraph number and citations omitted).
*1289 In Proposition Ten of his direct appeal, Grissom argued that his trial attorneys were ineffective for failing to request instructions on lesser included offenses. The OCCA rejected this claim on the merits:
We address these complaints applying the familiar test required by the Supreme Court in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This Court strongly presumes that counsel rendered reasonable professional assistance. Appellant must establish the contrary by showing: (1) that trial counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance. Spears v. State , 1995 OK CR 36, ¶ 54, 900 P.2d 431, 445. To determine whether counsel's performance was deficient, we ask whether the challenged act or omission was objectively reasonable under prevailing professional norms. In this inquiry, Appellant must show that counsel committed errors so serious that he was not functioning as the counsel guaranteed by the Constitution. Browning , 2006 OK CR 8,¶ 14, 134 P.3d at 830. The right to effective counsel is a means of enforcing the Constitution's guarantee of a fair and impartial trial, meaning a trial with a reliable result. The overriding concern in judging counsel's trial performance is "whether counsel fulfilled the function of making the adversarial testing process work." Hooks v. State , 2001 OK CR 1, ¶ 54, 19 P.3d 294, 317.
Where the Appellant shows that counsel's representation was objectively unreasonable under prevailing professional norms, he must further show that he suffered prejudice as a result of counsel's errors. The Supreme Court in Strickland defined prejudice as a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial or sentencing would have been different. Hooks , id. , citing Williams v. Taylor , 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). We will reverse the judgment and sentence only where the record demonstrates counsel made unprofessional errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland , 466 U.S. at 687, 104 S.Ct. at 2064. If the record before us permits resolution of a claim of ineffectiveness on the ground that Strickland 's prejudice prong has not been satisfied, we will ordinarily follow this course. Phillips , 1999 OK CR 38, ¶ 103, 989 P.2d 1017, 1043.
With regard to counsel's failure to object to allegedly inadmissible evidence and improper jury instructions, and to request different instructions at trial, our conclusions that the evidence was properly admitted at trial, and that erroneous jury instructions did not result in prejudicial error, foreclose any claim of ineffectiveness based on these omissions. Appellant simply cannot show a reasonable probability that, but for counsel's allegedly unprofessional errors, the outcome of the trial would have been different. Proposition Ten is therefore denied.
Grissom I, 253 P.3d at 993-94 (paragraph numbers omitted).
d) Grissom's challenge to the OCCA's analysis
Grissom argues that "[t]he OCCA repeatedly contradicted itself, and made several unreasonable factual and legal determinations in denying [his] claims regarding intoxication and lesser-included offenses." Aplt. Br. at 51. To begin, Grissom takes issue with the OCCA's conclusion that his trial attorneys' "early-trial expressions of [his] guilt foreclosed an intoxication defense and, thus, instructions on lesser-included offenses." Id. at 52. Grissom argues that the statements by his trial attorneys effectively conceding his *1290 guilt "did not irrevocably bind [him], nor did they preordain or require a first-degree murder directed verdict." Id. at 52-53. Moreover, Grissom notes, "the trial court controlled the case and instructed the jury that '[n]o statement or argument of the attorneys is evidence.' " Id. at 53 (quoting State Record at 597). In addition, Grissom notes that "[t]he defense ... evolved" over the course of the first-stage proceedings and his attorneys "unquestionably contested [his] ability to form specific intent and unquestionably pressed the defense of voluntary intoxication." Id. Ultimately, Grissom argues that "[t]he idea that trial counsel had the ability to foreclose a defense (and corresponding lesser-included offense) is erroneous." Id. He argues that "[d]efendants have no control over their defenses in Oklahoma, and cannot withdraw a defense." Id. Instead, he asserts, "[n]ot only is the trial court strictly duty-bound to instruct on any lesser-included offense supported by the evidence regardless of a request, the trial court also retains control to affirmatively instruct on a lesser-included offense even when the defense wishes to waive it." Id.
We reject Grissom's arguments for two reasons. First, the OCCA concluded as a matter of historical fact that "[d]efense counsel at no point contested [Grissom]'s guilt of first degree murder or the non-capital charges" and that "[t]he record [wa]s replete with counsel's statements that [Grissom] was admitting he committed first degree murder and the other crimes alleged, and was simply seeking to persuade the jury to spare his life due to his remorse and other mitigation evidence." Id. at 981. Grissom cannot establish that this was "an unreasonable determination of the facts" under 28 U.S.C. § 2254(e)(2). As the OCCA itself noted, it is true that Grissom's attorneys referenced his consumption of alcohol during first-stage closing arguments and suggested, albeit less than directly, that Grissom did not act with malice aforethought. But at no time did Grissom's attorneys expressly ask the jury to acquit him of any of the charged offenses. See generally Taylor v. Workman, 554 F.3d 879, 889 (10th Cir. 2009) ("Voluntary intoxication is not a lesser-included offense of homicide; rather it is a perfect defense to first degree murder). Instead, considering the trial record as a whole, the general defense strategy was to concede Grissom's guilt of the charged offenses and to focus on the second-stage strategy of establishing mitigating factors that would persuade the jury to spare Grissom's life. Thus, in our view, the OCCA reasonably concluded that "[b]y electing a sentencing stage defense, [Grissom] foreclosed his claim to first-stage jury instructions on lesser-included offenses." Grissom I, 253 P.3d at 982.
Second, and perhaps most importantly, our review of the trial transcript persuades us that the evidence would not have reasonably supported a verdict of second-degree murder. "To warrant an instruction on depraved mind [i.e., second degree] murder" under Oklahoma law, "the evidence must reasonably support the conclusion that the defendant committed an act so imminently dangerous to another person or persons as to evince a state of mind in disregard for human life, but without the intent of taking the life of any particular individual." Jackson v. State, 146 P.3d 1149, 1160 (Okla. Crim. App. 2006). The evidence presented at Grissom's trial would not have reasonably supported such a conclusion. To be sure, Grissom's actions at the Kopf home were imminently dangerous to another person or persons. But no juror could have reasonably found that Grissom did not intend to take the life of Amber Matthews. Specifically, the evidence clearly established that Grissom, after wrestling with Dreu Kopf and shooting and seriously injuring her, chased Amber *1291 Matthews from the living room of the Kopf's house into a bedroom and, despite her pleas for mercy, proceeded to shoot her not once, but twice in the head at close range.
Grissom also argues in his federal habeas appeal that the state trial court's instructions on voluntary intoxication "were confusing and incomplete." Aplt. Br. at 40; see id. at 55. In addition, Grissom argues that "[t]he OCCA usurped the trial judge's ground-level fact-finding role and determined the evidence did not equate to a prima facie case of intoxication." Id. at 55. These arguments are meritless. The OCCA, after examining the trial record, determined that the evidence presented at trial would not have allowed a jury to reasonably find that Grissom "was so intoxicated that he could not form the specific intent to commit these crimes." Grissom I, 253 P.3d at 985. And that determination, which was an issue of law rather than fact (as asserted by Grissom), was entirely reasonable. Although the evidence clearly indicated that Grissom had been drinking prior to the offense, there was simply no evidence from which the jury could have reasonably found that Grissom was so drunk that he was unable to form the intent to kill.[6] As we have discussed, the evidence indicated that Grissom's crimes involved at least some degree of planning, reasoning, and organization. Also, the evidence regarding Grissom's actions in shooting Matthews twice in the head at close range clearly established that he acted with the specific intent to kill her.
Relatedly, Grissom focuses on the OCCA's use of the phrase "prima facie case" in discussing whether a voluntary intoxication instruction was warranted. Specifically, Grissom argues that there is a difference "between a threshold finding of evidence sufficient for a prima facie case of intoxication, and [a] subsequent finding of overall insufficiency for a reasonable juror to accept the defense." Aplt. Br. at 62. Grissom is wrong on this point. The phrase "prima facie case" is generally defined to mean "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." Prima facie case, Black's Law Dictionary (10th ed. 2014). And that appears to be precisely the manner in which the OCCA was using the phrase. More specifically, by stating that the evidence presented at trial "did not create a prima facie case that [Grissom] was so intoxicated that he could not form the specific intent to commit these crimes," the OCCA was conveying its legal conclusion that the evidence presented at trial was insufficient to allow the jury to find in Grissom's favor on a voluntary intoxication defense.
Finally, with respect to his ineffective assistance claim, Grissom argues that "trial counsel absolutely should have known" that "lesser-included offense[ ] [instructions are] mandated in conjunction with intoxication instructions," and "[i]t was ineffective assistance of counsel that he did not." Aplt. Br. at 68. Grissom further argues that "[r]eversal is required" on this basis. Id. at 69. As for the OCCA's rejection of this ineffective assistance claim, Grissom argues only that the OCCA's analysis was "generic[ ] and cryptic[ ]." Id. at 70.
*1292 Grissom cannot, however, establish that the OCCA's rejection of his ineffective assistance claim was contrary to or an unreasonable application of clearly established federal law. As we have discussed, the evidence presented during the first-stage proceedings would not have reasonably allowed the jury to acquit Grissom of first-degree murder and instead find him guilty of second-degree murder. Consequently, Grissom was not prejudiced by his trial attorneys' failure to request instructions on lesser-included offenses.
In conclusion, Grissom has failed to establish his entitlement to federal habeas relief on the basis of his claims regarding the voluntary intoxication instructions given by the trial court and the trial court's failure to instruct on lesser-included offenses.[7]
Cumulative error
In Proposition Three of his appellate brief, Grissom asserts that he is entitled to federal habeas relief due to what he describes as cumulative errors in his case. According to Grissom, "[t]here were three critical inter-connected errors here" that "creat[ed] unreliability in the jury's sentencing determination." Aplt. Br. at 72. First, he argues, "the jury did not receive the benefit of critical first-stage instructions regarding [his] inability, due to his intoxication, to form malicious intent." Id. at 73. Second, Grissom argues, "the jury did not consider the evidence of [his] brain damage/organic brain deficits that mitigated both his intent in committing the crimes, and his culpability for them, because his counsel ... failed to fully investigate and present" such evidence. Id. Third, Grissom argues, "the jury was treated to a highly impassioned victim impact statement from Amber Matthews's father - statements the OCCA characterized as 'undoubtedly powerful.' " Id. (quoting Grissom I, 253 P.3d at 991 ). Grissom further argues that "[w]hile the trial court warned the victim's impact statement would be 'very emotional,' it gave the jury no legal guidance on what to do with such heart-wrenching evidence," and thus "[t]he only [effective] guidance came through the prosecutor's improper arguments" that sought sympathy for the victims and attempted to align the victims with law enforcement officers, prosecutors, and the jurors. Id. at 73-74.
a) Analytical framework
We have held "that when a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the right to a fair trial and due process.' " Hanson v. Sherrod, 797 F.3d 810, 852 n.16 (10th Cir. 2015) (quoting Darks v. Mullin, 327 F.3d 1001, 1017 (10th Cir. 2003) ). "The cumulative-error analysis addresses the possibility that '[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.' " Littlejohn, 875 F.3d at 567 (quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) ). In conducting this analysis, we aggregate the federal constitutional errors and consider whether those errors, collectively, "so fatally infected the trial that they violated the trial's fundamental fairness." Id. (internal quotation marks omitted).
b) The OCCA's rejection of Grissom's cumulative error claim
In Proposition Twelve of his direct appeal, Grissom argued that "the accumulation *1293 of errors in th[e] case warrant[ed] reversal or modification of the sentence." Grissom I, 253 P.3d at 996. The OCCA rejected this argument:
This Court found error in the district court's decision to give instructions on the defense of voluntary intoxication, and in the failure to give the uniform instruction on victim impact evidence. Appellant has not shown that these errors resulted in prejudice to him. The Court also found Appellant was erroneously charged with and convicted of grand larceny, and modified the conviction to larceny of a motor vehicle. We find no other errors and conclude the errors at trial had no cumulative effect that rendered the trial unfair or the outcome unreliable. Proposition Twelve requires no relief.
Id.
In his application for state post-conviction relief, Grissom "argue[d] that the cumulative impact of the errors identified in [his] direct appeal and post-conviction proceedings resulted in an unreliable and arbitrary sentence of death that violate[d] the Eighth and Fourteenth Amendments." Grissom II at 13. The OCCA rejected this argument:
In our mandatory sentence review on direct appeal, we considered the record as a whole and determined that Petitioner's death sentence was not the result of passion, prejudice, or other arbitrary factors. Grissom , 2011 OK CR 3, ¶ 84, 253 P.3d 969. After considering Petitioner's claim on post-conviction, we conclude that there is no cumulative impact of errors in the trial proceedings that renders Petitioner's death sentence unreliable.
Id.
Unfortunately, the OCCA did not specifically identify the errors that it considered as part of its post-conviction cumulative error analysis. We know, based on the OCCA's cumulative error analysis on direct appeal, that these errors necessarily included the trial court's failure at the conclusion of the second-stage proceedings to instruct the jury on the use of victim impact testimony. See Grissom I, 253 P.3d at 996 (expressly referring to this error). What we are unsure of is whether the OCCA considered, as part of its cumulative error analysis on direct appeal and post-conviction review, the claims of ineffective assistance of trial counsel that Grissom presented on direct appeal (failure to request instructions on lesser-included offenses and failure to investigate and present additional mitigating evidence). As we read Grissom I, the OCCA rejected both of these ineffective assistance claims on the basis of Strickland's prejudice prong, and thus presumably should have considered those claims as part of its cumulative error analysis. But the OCCA made no mention of these claims in its decision on direct appeal, even though it expressly mentioned other errors. Nor did the OCCA mention these claims as part of its cumulative error analysis on post-conviction review (of course, the OCCA did not specifically mention any errors in conducting that analysis).
Thus, in sum, we are left with uncertainty as to the specific claims that the OCCA considered as part of its cumulative error analysis. Fortunately, we need not resolve this uncertainty because, as discussed below, we conclude that Grissom's claim of cumulative error fails even on de novo review.
c) Analysis
We have, as discussed above, identified the existence of two individually harmless constitutional errors: the failure of Grissom's trial attorneys to seek instructions on lesser-included offenses during the first-stage of trial, and the failure *1294 of Grissom's trial attorneys to investigate and present available mitigating evidence during the second-stage of trial. More specifically, both of these claims were resolved exclusively on the basis of Strickland's prejudice prong, which means that, for purposes of cumulative error review, we have to consider them to be constitutional errors.
Grissom has also attempted to include a third substantive error as part of his cumulative error claim, i.e., that the trial court erred by failing to instruct the jury regarding the use of victim impact testimony, thus leaving the jury to rely on allegedly improper prosecutorial comments regarding the victim impact testimony. We did not, however, grant a COA as to that substantive claim. Nevertheless, assuming, for purposes of argument only, that the victim-impact claim can be considered as part of our cumulative error analysis, we conclude that these three errors, considered together, did not deprive Grissom of his right to a fair trial and due process.
The OCCA addressed the subject of the victim impact testimony in disposing of Grissom's direct appeal, and concluded that this evidence, "[w]hile undoubtedly powerful, ... was brief and carefully circumscribed." Grissom I, 253 P.3d at 991. The OCCA further concluded that, "[c]onsidering the instructions as a whole in light of the victim impact testimony given at trial, ... the error ... did not go to the foundation of the case or take from [Grissom] a right essential to his defense." Id. The OCCA also concluded that "[t]he error create[d] no grave doubt that it had any substantial influence on the outcome at trial, and [wa]s therefore harmless." Id. Grissom fails to establish that these conclusions were contrary to, or an unreasonable application of, clearly established federal law.
Considering the victim impact issue together with the claims of ineffective assistance of counsel-both for failing to request instructions on lesser-included offenses and for failing to present additional mitigating evidence-we are not persuaded that the cumulative impact of these errors rendered Grissom's death sentence unreliable or otherwise deprived him of his right to a fair trial. As we have explained, the jury in Grissom's case could not reasonably have convicted him of any lesser-included offenses during the first-stage proceedings and thereby effectively rendered him ineligible for the death penalty. Nor are we persuaded that either of the identified second-stage errors deprived Grissom of his right to a fair sentencing proceeding. Finally, we are not persuaded that these errors, considered collectively, "so fatally infected [Grissom's] trial that they violated the trial's fundamental fairness." Littlejohn, 875 F.3d at 567 (internal quotation marks omitted).
III
The judgment of the district court denying Grissom's petition for federal habeas relief is AFFIRMED.

Grissom's mother, Mary Grissom, also testified as a second-stage witness and testified that after Grissom disclosed to Barbara that he had been sexually assaulted while in prison in Texas, Barbara began calling him "queer" and "sissy."

Although Hall did not explain to the jury what a "normal IQ" meant, the jury was provided with a copy of Hall's written report, which stated that Grissom's "full scale IQ [was] 100, in the average range." Defendant's Exhibit 5 at 7.

We reject Grissom's argument that the district court erred by failing to grant discovery or conduct an evidentiary hearing on this claim.

The state trial court instructed the jury prior to the attorneys' first-stage closing arguments. Presumably, it was the state trial court's instruction to the jury regarding voluntary intoxication that prompted Grissom's attorneys to reference his "consumption of alcohol" during their closing arguments.

The state trial court instructed the jury that there were four elements of murder in the first degree: (1) the death of a human; (2) the death was unlawful; (3) the death was caused by the defendant; and (4) the death was caused with malice aforethought. State ROA at 633. The state trial court in turn instructed the jury that "malice aforethought" "means a deliberate intention to take away the life of a human being" and that "[t]he deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed." Id. at 634. The state trial court also instructed that "[t]he intent may have been formed instantly before commission of the fact [sic]." Id. Lastly, the state trial court instructed the jury that the external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life," and that "[e]xternal circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act." Id. at 635

In his opening appellate brief, Grissom points to various statements from his post-arrest interview to support his argument that the evidence presented at trial was sufficient to support a voluntary intoxication instruction and defense. But the videotape of his post-arrest interview reveals that Grissom remembered virtually all of the key events leading up to and during the commission of the crimes. That videotape, considered in its entirety, supports rather than refutes the OCCA's determination that a voluntary intoxication instruction was not warranted.

Having found no basis for granting federal habeas relief on this claim, we reject Grissom's contention that the district court erred in denying discovery and an evidentiary hearing on this claim.